STATE, Respondent, v. POWERS, Appellant.

*No. State 86. Submitted under sec. (Rule) 251.54 November 1, 1974.—Decided December 20, 1974.*
(Also reported in 224 N. W. 2d 206.)

The cause was submitted for the appellant on the brief of *Marvin H. Davis* of La Crosse, and for the respondent on the brief of *Robert W. Warren,* attorney general, and *Robert D. Martinson,* assistant attorney general.

DAY, J. Danny Edward Powers, the appellant (defendant), was found guilty of robbery by threatening the imminent use of force under sec. 943.32 (1) (b), Stats.,[1]

---

[1] "943.32 **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years: . . .

after a trial by jury. The trial court entered a judgment of conviction and sentence on March 12, 1973, sentencing defendant to an indeterminate term of not more than thirty months at the Wisconsin State Reformatory at Green Bay. From this judgment, defendant appealed.

Two questions are raised on this appeal: (1) Did the trial court err in refusing to submit to the jury the lesser-included crime of theft from a person; and (2) was there sufficient credible evidence for the jury to find the defendant guilty of the crime of robbery beyond a reasonable doubt?

On the evening of December 24, 1972, the defendant, aged nineteen years, a resident of Minnesota, in the company of Alan Torgeson, also from Minnesota, came to the city of La Crosse. After an initial stop in a tavern in La Crosse, they decided to get something to eat and went to Chris' tavern in La Crosse, where they met William Callahan at about 8 p.m. Mr. Callahan purchased several beers for the defendant and Mr. Torgeson and drank beer and 7-Up himself. At about 10 p. m., the three of them decided to go somewhere to eat because Chris' did not serve food. The bartender at Chris' placed two calls in an attempt to find a restaurant that was open. The decision was made to go to the Track Shack. They went in the defendant's car and the defendant did the driving. When they arrived, the Track Shack was closed and they then went to the Amazon Bar at about 11 p. m. Mr. Callahan again purchased several beers for the defendant and Mr. Torgeson. Mr. Callahan testified he suggested that the three of them go back downtown and the three of them left the Amazon Bar and went out to the parking lot and got into the defendant's automobile. The defendant sat in the driver's seat. Mr. Cal-

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property; . . ."

lahan sat in the front seat on the right-hand side and Mr. Torgeson sat in the back seat behind Mr. Callahan. After Mr. Callahan was in the car but before they drove away, Mr. Torgeson grabbed Mr. Callahan around the head, pulling Mr. Callahan's hair. Mr. Torgeson held some object to Mr. Callahan's throat and said, "Give us your money." Mr. Callahan testified that he gave them what he could and that the defendant "was helping himself on the left side," taking money from Mr. Callahan's person. Mr. Callahan testified that he had two $10 bills in his wallet and he estimated he had a total of about $30 to $35 at the time the defendant and Mr. Torgeson took his money. He was then driven a distance of about 10 to 15 miles from the Amazon Bar, during which time Mr. Torgeson continued to hold his head back. Mr. Callahan asked for his wallet and driver's license and the defendant returned these items to him and stopped the car. Mr. Torgeson then let go of Mr. Callahan, reached down and opened the front door next to Mr. Callahan and the defendant pushed him out of the car. The defendant then drove off. Mr. Callahan started to walk up the highway and after walking about a mile, a couple stopped and picked him up; he told them he had been robbed. They let him out at La Crescent, Minnesota, and he walked from there to the west channel bridge where he was picked up by a city of La Crosse policeman, Officer Roger Devine, in a city police car. He told Officer Devine what had happened and showed Officer Devine his empty wallet.

The presence of Mr. Callahan, Mr. Torgeson, and the defendant in Chris' bar was corroborated by the bartender. The presence of those same parties at the Amazon Bar was corroborated by the owner Eileen Johnson and a bartender at the Amazon. Eileen Johnson also testified on direct and cross-examination that the defendant, Mr. Torgeson and Mr. Callahan left the Amazon Bar together at the same time around midnight. Officer De-

vine testified that he picked Callahan up near the west channel bridge about 2:30 a. m. December 25, 1972.

The defendant and his codefendant, Mr. Torgeson, testified in their own defense. Up to the point of leaving the Amazon Bar, their testimony closely paralleled that of Mr. Callahan except that Mr. Callahan did not remember stopping at the Track Shack. Their testimony was diametrically opposed to Mr. Callahan's as to the occurrence immediately prior to leaving the Amazon Bar and what happened after that. Their testimony is that while at the Amazon the defendant decided he did not want to be driving Mr. Callahan around any more and that the two of them intended to leave Mr. Callahan at the bar and go home. Their testimony is that the defendant left first to warm up the car, was gone about three minutes and then was followed by Mr. Torgeson, who left alone, leaving Mr. Callahan at the Amazon Bar. They then testified that they drove home to Minnesota and that the time of leaving was shortly before 1 a. m.

At the close of the defendant's case, the case was sent to the jury and the jury found the defendant and Mr. Torgeson guilty of the crime of robbery.

The first question is, did the trial court err in refusing to instruct the jury on the lesser-included offense of theft from a person? [2]

---

[2] "943.20 **Theft.** (1) ACTS. Whoever does any of the following may be penalized as provided in sub. (3):

"(a) Intentionally takes and carries away, uses, transfers, conceals, or retains possession of movable property of another without his consent and with intent to deprive the owner permanently of possession of such property.

". . .

"(3) PENALTIES. Penalties for violation of this section shall be as follows: . . .

"(d) If the value of the property is less than $2,500 and any of the following circumstances exist, a fine of not more than $5,000 or imprisonment for not more than 5 years or both: . . .

"2. The property is taken from the person of another or from a corpse; or . . ."

This court has held that theft from a person is a lesser-included offense in the crime of robbery. *Moore v. State* (1972), 55 Wis. 2d 1, 197 N..W. 2d 820.

This court has often stated the test for determining when a jury should be instructed on a lesser-included offense. In *State v. Bergenthal* (1970), 47 Wis. 2d 668, 178 N. W. 2d 16, this court said, pages 674, 675:

" '. . . if the evidence, in one reasonable view, would suffice to prove guilt of the higher degree beyond a reasonable doubt, and if, under a different, but reasonable view, the evidence would suffice to prove guilt of the lower degree beyond a reasonable doubt, but leave a reasonable doubt as to some element included in the higher degree but not in the lower, the court should, if requested, submit the lower degree as well as the higher. . . .'

"The key word in the rule is 'reasonable.' The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if 'under a different, but reasonable view,' the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury."

There must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction of the lesser charge in order to justify submission of an instruction on a lesser-included offense.

In the recent case of *Ross v. State* (1973), 61 Wis. 2d 160, 170, 211 N. W. 2d 827, this court stated:

"To give an instruction on a lesser included offense when the commission of that lesser included offense is not reasonably shown by the evidence is no favor to a defendant. The inclusion of a doubtful lesser included offense is likely to result in a jury's compromise to the detriment of the defendant. Numerous cases arise in which the proper alternative for the jury is either the conviction on the major crime or a complete acquittal.

To superfluously add to the verdict a lesser included offense may well in some cases result in the defendant being found guilty of that offense when a verdict of not guilty should have been returned."

In the case at bar, the defendant was originally charged with armed robbery, but this charge was reduced after the preliminary examination to robbery by threatening the imminent use of force. A conviction of theft from a person does not require a finding of threat of force. The submission of the lesser offense here could be justified only if the jury could have found that the defendant and Torgeson took Callahan's money from his person but did so without threatening the use of force. We conclude that this would not be a reasonable view of the evidence. Mr. Callahan's testimony, that Mr. Torgeson grabbed him from behind, held his head back, pulled his hair and held an object to his throat, demanded his money, and that while he was in this position, the defendant took money from his person, if believed by the jury, certainly supports the view that the defendant and Mr. Torgeson threatened Mr. Callahan with the imminent use of force with the intent to compel him ". . . to acquiesce in the taking or carrying away of the property . . ." When Mr. Callahan was asked what he was doing during the period of time that the object was held against his throat and his head was held back by Mr. Torgeson, he replied, "Holding my head nice and stiff." There was no testimony or evidence that the money was taken from Mr. Callahan in any other manner. If the jury believed the testimony of the defendant and Mr. Torgeson, there was no taking at all; if it believed Mr. Callahan's version, then the charge was amply supported. There was no middle ground.

We conclude that it was not error for the trial court to deny the defendant's request for submission of the lesser charge of theft from the person included in the charge of robbery.

The second question is, was there sufficient credible evidence for the jury to find the defendant guilty of the crime of robbery beyond a reasonable doubt?

The test for determining the sufficiency of the evidence is whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendant's guilt beyond a reasonable doubt. *Gauthier v. State* (1965), 28 Wis. 2d 412, 416, 137 N. W. 2d 101. This court stated in *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725:

"The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. . . The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding."

The defendant's attack on the sufficiency of the evidence is essentially an attack on Mr. Callahan's credibility as a witness. As counsel for the defendant states in his brief, ". . . the alleged victim, Mr. Callahan, could not be believed."

Mr. Callahan was a forty-nine-year-old postal clerk who had lived in La Crosse since 1948. He testified that he had a nervous condition; that he was being treated for this condition by a psychiatrist and that on the day in question he had arisen about 11 a. m., took some pills including tranquilizers (valium and librium) which had been prescribed by his physician and had gone to a tavern to watch a ball game. He testified that he drank 7-Up; he returned to his room and tried unsuccessfully to rest and then went to Chris' tavern at about 5 p. m. He further testified that he kept drinking 7-Up until about 8 p. m., when he had his first beer. He testified he drank

only two beers at Chris'. The bartender at Chris' testified that Mr. Callahan was not intoxicated when he left there. This was contrary to the testimony of Mr. Torgeson, who said that Mr. Callahan had tried to make a phone call, had dropped the change on the floor, could not dial the number and that Mr. Torgeson had dialed two different numbers for Mr. Callahan. Mr. Callahan admitted taking librium late in the afternoon and admitted that it was easier for him to become intoxicated after taking tranquilizers. He could not remember how many rounds of drinks he purchased for the defendant or for Mr. Torgeson; also Mr. Callahan had had nothing to eat all day. Mr. Callahan testified that he thought he had three beers all the time that he was at the Amazon. However, both the owner and the bartender of the Amazon testified that Mr. Callahan was in fact intoxicated. On cross-examination, Mr. Callahan admitted he was not sure he had actually walked out of the bar with the defendant. There was also confusion as to whether or not Mr. Callahan knew the names of the defendant and Mr. Torgeson; they testified that he did and the owner of the Amazon testified that Mr. Callahan introduced the defendant and Mr. Torgeson to her. Mr. Callahan testified he did not know the names of either of the men. Mr. Callahan testified that when he took tranquilizers it would sometimes cause him to have "blank spots" and he also testified that he had been hospitalized in a psychiatric ward three or four times, the last time was for a period of five weeks around the previous Thanksgiving. Mr. Callahan testified that tranquilizers made him "droopy." He also could not remember if they had stopped at the Track Shack prior to going to the Amazon Bar. He could recall nothing about the automobile the defendant drove; he did not know the make, the color, whether it had two or four doors, or whether it had bucket or bench seats in the front where he was sitting.

The credibility of Mr. Callahan's testimony was a matter for the jury to determine. The jury obviously believed Mr. Callahan's version of the night's happenings and did not believe the version offered by the defendant or by Mr. Torgeson. Where the testimony of witnesses is in conflict, the weight to be accorded such testimony is for the jury. *Gaddis v. State* (1974), 63 Wis. 2d 120, 128, 216 N. W. 2d 527. The mere fact that Mr. Callahan testified he was not intoxicated and other witnesses testified that he was intoxicated was merely another factor to be weighed in determining the credibility of his testimony, but the effect to be given to that conflict in the testimony as to Mr. Callahan's state of sobriety and the extent to which it may have affected his testimony if he was intoxicated was a matter for the jury.

This court has frequently stated that it cannot reverse a jury verdict where credibility is the issue unless it can conclude as a matter of law that no finder of fact could believe the testimony relied on for conviction. *State v. Wind* (1973), 60 Wis. 2d 267, 275, 208 N. W. 2d 357. From reading the record, we conclude Mr. Callahan's testimony was not inherently incredible.

The defendant points out that both he and Mr. Torgeson had been required by the owner of the Amazon Bar to sign an identification form and the defendant had presented his driver's license showing his name, address, and physical description. This information was copied onto a form which the tavern required be filled out by patrons who appeared to be under age. Both Mr. Torgeson and defendant signed their names to the identification slips and the argument is that they would not have done this and so thoroughly identified themselves if they had intended to rob the person whom they were with in the tavern. This is an argument, of course, to be made to the jury. There was also testimony by the owner of the Amazon Bar and the bartender there, as well as by

Mr. Torgeson himself, that Mr. Torgeson was in fact intoxicated but that the defendant, Mr. Powers, was not. The sobriety of the defendant and the intoxication of Mr. Torgeson, along with the signing of the identification forms, were merely additional facts in the evidence that the jury considered in arriving at its verdict.

We conclude there was sufficient credible evidence for the jury to have found the defendant guilty of the crime of robbery.

In *State v. Duda* (1973), 60 Wis. 2d 431, 435, 439, 210 N. W. 2d 763, this court in determining whether the trial court erred in refusing to grant the defendant's motion to dismiss for insufficiency of evidence at the close of the state's case said:

"The test of the sufficiency of the evidence on a motion to dismiss in the trial court is the same as that on appeal. It is whether, considering the state's evidence in the most favorable light, the evidence adduced, believed and rationally considered, is sufficient to prove the defendant's guilt beyond a reasonable doubt."

Applying this test to the case at bar, we conclude the trial court did not err in refusing to grant defendant's motion for dismissal at the conclusion of the state's case.

*By the Court.*—Judgment affirmed.